IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | NO. 3:18-cr-00186 |
| v. ) | |
| ) | JUDGE CAMPBELL |
| JOEY FAUGHT ) | |

MEMORANDUM AND ORDER

I.   INTRODUCTION

Pending before the Court is Defendant's Motion to Suppress Evidence. (Doc. No. 22). The Government responded to the motion. (Doc. No. 27). On December 10, 2020, the Court held a hearing on the motion. (Doc. No. 53; Hearing Trans, Doc. No. 67). The parties then filed post-hearing briefs. (Doc. Nos. 70, 71, 74).

II.   FACTS[1]

The evening of January 9, 2018, Sergeant Matthew Boguskie was remotely monitoring video surveillance of the James Cayce Homes. He observed two individuals, one of whom was later determined to be Joey Faught, "go to the side of a building" as if "trying to get out of main view of anybody that was out and about." (Boguskie, Doc. No. 67 at PageID# 293). He observed them meet briefly by the side of the building and engage in "some sort of hand transaction" that did not appear to be a handshake. (*Id*.). The individuals then separated and headed in opposite directions – one person on a bicycle, the other on foot. (*Id*.).

That evening, while Sgt. Boguskie was observing surveillance footage of the area, Officers Wolterbeek and Mackey were patrolling the area on foot. (*Id*., PageID# 294, 344-45). Sgt.

---

[1]   The facts are primarily drawn from the testimony and evidence presented during the hearing held on December 10, 2020. (Hearing Trans., Doc. No. 67).

Boguskie was their direct supervisor. (*Id.*). After observing Defendant in the surveillance video, Boguskie notified Wolterbeek over the radio that he thought he might have just seen a drug transaction, gave him a description of the individual, and directed them to catch up to the individual on foot and "make contact." (*Id.* at PageID# 293).

Boguskie followed the Defendant via the cameras in the area, except for a brief time when he was not in view of any camera. (*Id.* at PageID# 297-98). Sgt. Boguskie testified that he was certain the person the officers eventually stopped was the same individual he followed on camera from the courtyard. (*Id.*). Officers Wolterbeek and Mackey signaled to a third officer, Officer Barfield, who was in the Defendant's line of travel, that he should "stop him." (*Id.* at PageID# 351). Barfield approached Defendant and spoke with him for about 30 seconds before Wolterbeek and Mackey arrived.[2] Officer Wolterbeek testified that as he approached, he observed Officer Barfield talking to the Defendant and that the Defendant appeared agitated and was turning his body slightly away from Barfield, a move Wolterbeek described as "blading." (*Id.* at PageID# 351, 355, 397).

Officer Wolterbeek testified that he felt the need to conduct an immediate pat-down because Defendant was suspected of having engaged in a drug transaction and based on his training and experience, was likely to have a weapon. He stated,

> [Based on] my training and experience, when a narcotic transaction takes place, that is a high-risk transaction that it taking place between two individuals that may or may not know each other, and then during those transactions it is very common for one, if not both, parties to be armed with a weapon. And since my supervisor, Sergeant Boguskie, told me he had just observed a narcotic transaction, I believed that individual to be armed.

(Doc. No. 67 at PageID# 355). He added that his observation of Defendant being agitated and

---

[2] Defendant was recording video with his cell phone. (Def. Ex. 1). On the video Officer Barfield can be heard calling out to Defendant at 02:12 and approaching at 2:23. Wolterbeek arrives at approximately 02:50.

2

blading away from Officer Barfield heightened his suspicion that the Defendant was armed. (*Id*. at PageID# 356). He explained that blading – shifting or turning to the side with the weapon slightly away – is something they are taught at the police academy may be indicative of a weapon. (*Id*. at PageID# 354, 372).

Officer Wolterbeek conducted a pat-down and felt a gun near Defendant's groin. (PageID# 352). He asked Defendant what it was, and Defendant said it was his gun. (*Id*.). After determining that Defendant was a convicted felon, the officers conducted a more thorough search of Defendant's person and did not find any controlled substances.

### III.    ANALYSIS

The Government argues that the officers were justified in conducting a brief investigatory *Terry* stop of the Defendant based on a reasonable suspicion that he had engaged in a narcotics transaction and that the pat-down to check for weapons was justified based on a reasonable suspicion that Defendant was armed. Defendant argues the evidence is insufficient to support a reasonable suspicion that Defendant was engaged in criminal activity or that he was armed. Defendant seeks suppression of the gun and the "gun questionnaire" as fruit of an unconstitutional search and seizure.

**A.  The *Terry* Stop**

The Sixth Circuit has explained that there are three type of permissible encounters between the police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if nonconsensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011).

With regard to an investigation detention, or *Terry* stop (based on *Terry v. Ohio*, 392 U.S.

3

1, 21, (1968)), officers "may briefly detain a person for investigative purposes so long as it is 'reasonable.'" *United States v. Young,* 707 F.3d 598, 603 (6th Cir. 2012). The Sixth Circuit applies a two-part analysis in determining whether a *Terry* stop is reasonable: first, the court asks whether there was reasonable suspicion to initiate the stop; and second, whether the stop was reasonable in scope. *Id.* In considering the first question, the court determines "'whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion' of criminal activity." *Id.* (quoting *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)). The officer "must have a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* (quoting *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006)). The Court looks to the "totality of the circumstances when the *Terry* stop commenced" in making that assessment. *Id.* The Court "must give due weight to the officers' factual inferences in deference to their specialized training, which allows them to make deductions that 'might well elude an untrained person.'" *United States v. Johnson*, 428 F. App'x 616, 620 (citing *United States v. Luqman*, 522 F.3d 613, 616 (6th Cir.2008)).

Sgt. Boguskie testified that he believed Defendant may have engaged in a narcotics transaction based on the following evidence: (1) the location in a high crime area; (2) Defendant and the other individual moved to the side of a building potentially to remove themselves from open view; (3) their meeting was very brief; (4) they had an interaction that involved a meeting of hands but was not a handshake; and (5) they quickly separated and left in opposite directions. (Doc. No. 67 at 293). Sgt. Boguskie acknowledged that he could not see what, if anything, was passed between the Defendant and the other individual, but that based on his experience he believed they had likely engaged in a drug transaction.

The Court notes that Sgt. Boguskie's experience is significant. At the hearing, he described his ten-year career as a Metro Nashville police officer, which included approximately five years involving controlled purchases of narcotics. He estimated that he had participated in or observed "somewhere in the range of 500 undercover purchases or controlled buy operations" prior to the events of January 9, 2018. (*Id*. at PageID# 289). The Court found him to be an exceedingly credible and informative witness. Based on his testimony, the Court concludes that the factors articulated by Sgt. Boguskie are sufficient to justify a *Terry* stop.

Defendant argues that the activity Sgt. Boguskie observed is individually and collectively consistent with innocent activity. The hand transaction that was not a handshake could have been some other form of hand greeting such as a fist-bump.[3] They could have walked to the side of the building because that is where the other individual left his bicycle, fist-bumped goodbye, and went their separate ways.

However, an innocent explanation for the conduct does not foreclose the finding that the officers had reasonable suspicion to justify a *Terry* stop. *See e.g.*, *United States v. Arvizu,* 534 U.S. 266, 277 (2002) ("[A] determination that reasonable suspicion exists … need not rule out the possibility of innocent conduct."). Moreover, neither the officer nor the Court consider the circumstances in isolation. Rather, the court must consider whether the totality of the circumstances give rise to reasonable suspicion. *See e.g.*, *Johnson*, 428 F. App'x at 620 ("Even though a defendant might advance an innocent explanation for actions that the officers believed gave rise to 'reasonable suspicion,' we need not adopt the explanation; 'the question is whether,

---

[3] Defendant refers to this hand greeting, which he describes as "two fists that touch each other then separate," as a "fist pump." (*See* Doc. No. 70 at 8, 15, 16, 17; Doc. No. 74 at 2, 4, 5). The Court believes that the correct term for the gesture described is "fist bump." According to the online Merriam-Webster dictionary, a "fist pump" is "a celebratory gesture in which the fist is raised in front of the body and then quickly and vigorously drawn back; and a "fist bump" is "a gesture in which two people bump their fists together (as in greeting or celebration)." *See* merriam-webster.com (Mar. 5, 2021).

5

when looking at the facts in total, the officers had reason to believe that criminal activity was afoot.'"); *Arvizu*, 534 U.S. 266, 274 (2002); *United States v. Sokolow*, 490 U.S. 1, 9 (1989) ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel … [b]ut … taken together they amount to reasonable suspicion."). In addition, the Court must give "due weight to the officers' factual inferences." When done so here, the Court must conclude that the specific facts, when considered in totality, give rise to a reasonable suspicion of criminal activity that justified an investigatory stop.

In addition, to the extent Defendant claims the information conveyed from Sgt. Boguskie to Officer Wolterbeek was insufficient to warrant a stop, the Court rejects this contention. Sgt. Boguskie testified that he was "confident in the fact that he believed a drug transaction just occurred." (Doc. No. 67 at PageID# 321). If he had been in the field, Sgt. Boguskie would have been justified in conducting a *Terry* stop himself. His testimony indicates that he directed the officers in the field to investigate. (*Id.*). While the Court does not know the precise words Sgt. Boguskie used to convey this directive, Officer Wolterbeek received the intended message and proceeded to investigate. The Court finds it was reasonable for him to initiate an investigatory stop based on Sgt. Boguskie's description and directive.

**B. Reasonable Belief Defendant Was Armed**

The Court then must consider whether the officers were justified in conducting a "pat-down." "When an individual is subject to a lawful investigative detention, an officer may conduct a limited frisk or pat-down of that person for weapons if the office has a reasonable suspicion of criminal activity and a reasonable belief that the suspect is armed and dangerous." *United States v. Akinyemi*, 101 F. App'x 109, 111 (6th Cir. 2004). Officers who stop a person who is "reasonably suspected of carrying drugs" are "entitled to rely on their experience and training in concluding

6

that weapons are frequently used in drug transactions," and use reasonable measures to protect their safety. *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001). The Sixth Circuit has regularly affirmed protective pat-downs for weapons where an officer reasonably suspects drug activity. *See e.g.*, *Akinyemi*, 101 F. App'x at 111; *United States v. Carter*, 558 F. App'x 606, 612 (6th Cir. 2014) ("officers could reasonably rely on the well-known fact that drug-trafficking often involves the use of weapons, creating the necessary nexus between drug transactions and weapons searches"); *United States v. Young*, 277 F. App'x 587, 589 (6th Cir. 2008) (holding that a pat-down was reasonable when officers reasonably suspected the suspect of carrying drugs); *United States v. Hardin*, 248 F.3d 489, 499 (6th Cir. 2001) ("This Court has held many times that guns are 'tools of the trade' in drug transactions.").

In this case, Officer Wolterbeek performed a pat-down as soon as he encountered the Defendant. He testified that, based on the information he received from Sgt. Boguskie, he believed the Defendant had just consummated a drug transaction. He conducted a pat-down because, based on his training and experience, it is very common for individuals engaged in drug transactions to be armed with a weapon. (Doc. No. 67 at PageID# 354). In addition, Officer Wolterbeek stated that as he approached the Defendant he observed that the Defendant "very agitated" and "blading away" from Officer Barfield. Wolterbeek stated that these additional factors contributed to his suspicion that Defendant was armed. (Doc. No. 67 at PageID# 354). He explained that, based on his police training and experience, blading is often an attempt to conceal a weapon.[4] (*Id.*).

At the hearing, Sgt. Boguskie testified that he expected the officers in the field would conduct a pat-down when they stopped the suspect to investigate. He stated,

> So in this instance, based on my time in the Crime Suppression Unit and Gang

---

[4] Sgt. Boguskie testified that in officer training they learn that a blading stance can be indicative of someone who is carrying a firearm. (Doc. No. 67 at PageID# 323). He stated that, from the camera angle he was looking at, he did not observe Defendant blading. (*Id.*).

7

> Unit, I was confident in the fact that I believed a drug transaction just occurred. So that's why I told my officers to investigate and why I say I would expect somebody who was investigating this to conduct a pat-down. That's based on what I know.
>
> Now, I'm not sitting here saying that every trainee that some out of the police academy will have that same level of knowledge, but based on this instance, yes, absolutely, that is what I would expect.
>
> …
>
> I didn't flat out tell them [to do a pat-down] because I felt like I didn't have to.

(Doc. No. 67 at PageID# 321).

Defendant contends that Officer Wolterbeek lied about the basis for the stop and the pat-down and that his testimony should be completely disregarded as not credible. (Doc. No. 70 at 16, 18; Doc. No. 74 at 5). Defendant points to several alleged inconsistencies between Officer Wolterbeek's statements at the preliminary hearing, in the arrest affidavit, and at the suppression hearing.

At the state preliminary hearing, Officer Wolterbeek testified that he conducted a pat-down for weapons because he believed the suspect was armed and dangerous based solely on the information received from his supervisor that Defendant had just engaged in a narcotic transaction.[5] (Prelim. Hearing Trans., Doc. No. 70-1 at 6-10). Although he also stated that Defendant squared off toward the officers and was agitated, he did not indicate that these additional factors contributed to his suspicion that Defendant was armed. (*Id.*). Defendant argues that this is at odds with Officer Wolterbeek's testimony at the suppression hearing where he states that he believed Defendant was armed because of his suspected involvement in a drug transaction and that

---

[5] An audio recording of the Preliminary Hearing was filed with the Court. Defendant filed an unofficial transcript of the preliminary hearing with the supplemental brief. (Doc. No. 70-1). For ease of reference, the Court cites to the transcript.

Defendant's agitation and blading heighted this belief.

Defendant also identifies the following alleged inaccuracies in the arrest affidavit. (Arrest Affidavit, Doc. No. 70-2). First, he contends that although the affidavit states that officers never lost sight of the suspect on camera, in fact, Boguskie testified that there was a "brief second" where Defendant was not on camera. (*See* Doc. No. 70-1 at 2; Doc. No. 67 at PageID# 298). Second, the affidavit states that an officer "observed a hand to hand take place," when Sgt. Boguskie's testimony was that he "thought" he "might" have seen a drug transaction. (*See* Doc. No. 67 at PageID# 314). Third, in the affidavit Wolterbeek states that he conducted a protective search for weapons due to the fact that Defendant "was making assertive movements toward his waistband and blading away from officers," when he testified in the state hearing that the protective search because Defendant was suspected of engaging in a drug transaction and was therefore presumed to be armed. (Doc. No. 70-1 at 6, 10).

None of these inconsistencies is cause to wholly discredit Officer Wolterbeek's testimony. There is no indication that Wolterbeek knew that Sgt. Boguskie lost sight of the Defendant on the camera for a brief second or that this slight inaccuracy was material. With regard to the certitude of Sgt. Boguskie's directive to the officers on the ground, neither of the officers recalled the exact words used to convey the information about the suspected drug transaction and a description of the suspect. However, the testimony was clear that Sgt. Boguskie believed he had observed a drug transaction and that he directed the officers on the ground to catch up to the suspect and investigate. It was reasonable for the officers on the scene to follow his directive and rely on the information given.

As to the variations in testimony from the preliminary hearing in January 2018 to the suppression hearing in December 2020, slight differences are undoubtedly attributable to the

9

almost three-year passage of time. The Court finds it unsurprising that the testimony at the suppression hearing, where the entire focus was on the justification for the stop and pat-down, elucidated more explanation and detail than that of the preliminary hearing. Moreover, Officer Wolterbeek's description of the underlying facts has not changed. An objective consideration of those facts indicates that the officer reasonably believed the Defendant was armed.

Defendant also contends that the video testimony contradicts Officer Wolterbeeks testimony that he was agitated and blading away from Officer Barfield. Contrary to Defendant's assertion, the video does not clearly refute what the Court finds to be credible testimony. Given the camera angle, which appears to be held at waist level directed upward toward Defendant's head and shoulders, and that the camera at times pans away, the Court cannot conclude that Officer Wolterbeek's perception that Defendant was blading away from Officer Barfield was unreasonable. Nor does the video clearly contradict Officer Wolterbeek's statement that the Defendant appeared agitated.

Moreover, Officer Wolterbeek did believe Defendant was armed solely based on his perceived agitation and blading; Defendant was suspected of having engaged in a drug transaction and was in a high crime area. Even discounting the additional factors, the reasonable suspicion of drug transaction is itself sufficient to justify a brief pat-down for weapons. *See Young*, 277 F. App'x at 589; *Akinyemi*, 101 F. App'x at 111. In addition, the Court considers Officer Wolterbeek's two and a half years of experience as a police officer and specialized training in counter-narcotics enforcement, which led him to conclude there was a reasonable suspicion that Defendant may have been armed.

On this record, the Court finds the officer had reasonable suspicion that Defendant was armed that justified a pat-down search.

10

## IV. CONCLUSION

For the reasons stated above, the Court concludes that the officers' testimony establishes that they had reasonable suspicion that Defendant was engaged in a drug transaction, reasonably inferred that he was armed, and were entitled to conduct a pat-down to check for weapons. Accordingly, Defendant's Motion to Suppress (Doc. No. 22) is **DENIED**.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE